## Appeal of CLEVELAND & WESTERN COAL CO.

Docket No. 2341.     Submitted August 20, 1925.     Decided April 23, 1926.

1. Where income is derived in part from trading as a principal and in part from contracts with coal producers, involving the use of capital in financing such producers and marketing their coal, and three stockholders collectively holding a substantial amount of stock devote none of their time to the business, and other stockholders devote only a part of their time thereto, personal service classification will be denied.

2. Where a corporation has a large amount of capital stock fully paid in and, through credit extended to it, it is enabled to own large business facilities, finance customers, and maintain large inventories, and derives its entire income from trading as a principal, personal service classification will be denied.

3. A corporation issued stock to an individual at par, fully paid and nonassessable, in part as bonus for purchase of preferred stock, and in part in consideration of good will and patronage which such individual brought to its business and of services rendered in promoting and financing the corporation. *Held*, that the stock was not issued solely for good will and that evidence of sales to customers procured by such individuals was insufficient to establish that good will had any cash value.

4. Amounts paid to an individual for his influence in bringing about the dissolution of a receivership of a corporation with which taxpayer desired to enter into a contract, and to one of the receivers for consenting to the dissolution, may not be included in invested capital, since they were not expended for any asset used in the business and were not proper capital expenditures.

5. The fact that taxpayer considers its tax too high and that taxes of other corporations are lower than that proposed against taxpayer is insufficient to prove that exceptional hardship had been worked or that a gross disproportion exists owing to abnormal conditions.

6. Efficient operation of a business resulting in a greater than average rate of turnover of capital does not produce abnormality warranting special assessment.

*C. F. Taplin, Esq., J. L. Steinbugler, Esq.,* and *H. A. Mihills, C. P. A.,* for the taxpayer.
*Edward C. Lake, Esq.,* for the Commissioner.

Before GREEN, LANSDON, and LOVE.

The taxpayer, the Cleveland & Western Coal Co., as the parent company, and the Wisconsin Coal & Dock Co., as the subsidiary company, filed consolidated returns for the years 1918 and 1919 as a personal service corporation. The Commissioner determined a deficiency in the income and profits taxes on the consolidated net income amounting to $304,667.38 for the year 1918 and $46,669.76 for the year 1919. The deficiency results from denial to both companies of classification as a personal service corporation; from the disallowance as part of invested capital of an item of good will in the amount of $87,300 and an additional item of $15,300, and from the denial of affiliation with two subsidiaries.

FINDINGS OF FACT.

The Cleveland & Western Coal Co. is an Ohio corporation organized during the month of February, 1913, with its principal place of business in Cleveland. At its organization the taxpayer had an authorized capital of $250,000, divided into $100,000 of preferred and $150,000 of common stock. The preferred stock was all issued for cash on the basis of $100 per share. Common stock of the par value of $50,000 was issued to F. E. Taplin at the time of incorporation in consideration of the good will and patronage which he

brought to the company and of his services rendered and to be rendered in the promotion and financing of the company. Common stock of the par value of $37,300 was issued as a bonus to the purchasers of preferred stock at the rate of one-half share of common for each share of preferred. Up to March 31, 1915, there had been issued $80,000 par value of preferred stock and $87,300 par value of common stock.

Some time prior to January 1, 1918, the authorized capital stock of the Cleveland & Western was increased. There was outstanding on that date $500,000 common capital stock, all of the preferred stock having been theretofore retired by conversion into common stock. On October 1, 1918, the capital stock was increased from $500,000 to $1,000,000, all of the increase being issued for cash or tangible property.

The Wisconsin Coal & Dock Co. was organized in December, 1916, and had during the years 1918 and 1919 outstanding capital stock of the par value of $100,000, all of which was issued for cash or tangible property. The Cleveland & Western owned all the outstanding stock of the Wisconsin Coal & Dock Co. during the years in question.

The stockholders of the Cleveland & Western owned and controlled considerable capital stock of three other corporations—the Meadow Lands Coal Co., the Standard Island Creek Coal Co., and the A. J. Morgan Coal Co. The Cleveland & Western alleged in its petition that these three corporations were affiliated with it during the years 1918 and 1919, but at the hearing it was conceded that it was not affiliated with these corporations during such years.

The capital stock of the Cleveland & Western was held, on the dates shown, by the following individuals:

| Name | Jan. 1, 1918 | Jan. 1, 1919 | Jan. 1, 1920 |
|---|---|---|---|
| | Shares | Shares | Shares |
| F. E. Taplin | 2,814 | 4,814 | 4,814 |
| C. G. Taplin | 186 | 186 | 186 |
| J. M. Todd | 700 | 1,400 | 1,400 |
| C. F. Taplin | 550 | 1,100 | 1,100 |
| E. W. Astel | 250 | 500 | |
| A. P. King | 500 | 1,000 | 1,000 |
| Edith S. Taplin | | 1,000 | 1,000 |
| C. F. Taplin (trustee) | | | 500 |
| Total | 5,000 | 10,000 | 10,000 |

C. G. Taplin was a director but did not devote any time to the business and received no salary. C. F. Taplin was a practicing attorney and maintained an office in which he conducted his profession; he devoted part of his time to the business of the company. A. P. King devoted his entire time to the business of the Wisconsin Coal & Dock Co. and was not engaged in the business of the Cleveland & Western. Edith S. Taplin did not devote any time to the

business of the company and was paid no salary. The other stock-holders owned stock in other corporations which were engaged in mining coal and they devoted only a portion of their time to the conduct of the business of the Cleveland & Western.

The balance sheets of the Cleveland & Western Coal Co., at the beginning of each of the years 1918, 1919, and 1920, are as follows:

|  | Jan. 1, 1918 | Jan. 1, 1919 | Jan. 1, 1920 |
|---|---|---|---|
| ASSETS |  |  |  |
| Cash | $58,880.42 | $27,585.94 | $19,527.46 |
| Notes receivable, S. I. C. C. Co | 348,100.00 | 580,016.67 | 580,016.67 |
| Notes receivable for stock | | 310,000.00 | 196,386.75 |
| Notes receivable—trade | | 76,012.00 | 40,000.00 |
| Trade accounts receivable | 785,172.69 | 364,418.74 | 395,809.80 |
| Accounts receivable | 823,092.23 | 555,490.33 | 220,193.64 |
| Coal in transit and unbilled | 3,362.87 | 17,039.76 | 21,003.36 |
| Consignment account | 106,442.45 | | |
| Deferred charges (ins.) | 1,976.68 | 1,756.11 | 1,786.00 |
| Advances to officers and salesmen | 1,660.08 | 2,000.00 | |
| Stock Oronoca Mining Co | 58,000.00 | 58,000.00 | 58,000.00 |
| Stock Wisconsin Coal & Dock Co | 100,000.00 | 100,000.00 | 100,000.00 |
| U. S. Liberty bonds and Treasury company | 220,000.00 | 282,735.00 | 1,286,200.00 |
| Furniture and fixtures | 5,218.22 | 5,431.59 | 5,618.88 |
| Interest accrued in Liberty bonds | 1,260.97 | 2,370.08 | 15,653.09 |
| Life insurance (surrender value) | 2,791.00 | 4,547.50 | 6,424.00 |
| Advances to mining companies | | 390,000.00 | 390,000.00 |
| Advances to branch offices | | | 1,715.00 |
| Stock United Coal & Dock Co | | | 125,000.00 |
| Treasury stock | | | 87,500.00 |
|  | 2,515,957.61 | 2,777,403.72 | 3,550,834.65 |
| LIABILITIES |  |  |  |
| Notes payable | 325,000.00 | 415,000.00 | 869,287.85 |
| Accounts payable (general) | 704,095.84 | 447,021.79 | 482,223.95 |
| Accounts payable S. I. C. C. Co | 1,927.18 | 9,795.81 | 136,782.02 |
| Accrued items | 8,971.72 | 12,543.44 | 890.33 |
| Suspense | | 263.91 | 1,190.60 |
| Capital stock | 500,000.00 | 1,000,000.00 | 1,000,000.00 |
| Surplus | 975,962.87 | 892,778.77 | 1,060,459.90 |
|  | 2,515,957.61 | 2,777,403.72 | 3,550,834.65 |

The balance sheets of the Wisconsin Coal & Dock Co., at the beginning of each of the years 1918, 1919, and 1920, are as follows:

|  | Jan. 1, 1918 | Jan. 1, 1919 | Jan. 1, 1920 |
|---|---|---|---|
| ASSETS |  |  |  |
| Cash | $1,883.36 | $2,099.67 | $104.33 |
| Trade accounts receivable | 272,561.24 | 195,856.92 | 230,786.11 |
| Coal inventory | 579,460.71 | 347,423.30 | |
| Deferred charges | 2,928.28 | | |
| Advances | 550.00 | 533.00 | |
| Furniture and fixtures | 1,247.88 | 1,057.88 | |
| Dock properties | 84,360.74 | 99,860.04 | 91,887.28 |
| Prepaid expenses, etc | 12,877.76 | 12,086.37 | 95.13 |
| Investment Liberty bonds | | 9,800.40 | |
|  | 955,869.97 | 668,708.85 | 322,872.85 |
| LIABILITIES |  |  |  |
| Accounts payable (general) | 10,494.85 | 12,937.84 | 1,501.61 |
| Accounts, Cleveland & Western Coal Co | 823,092.23 | 555,490.33 | 220,193.64 |
| Accrued expenses | 2,949.79 | 16,184.84 | |
| Reserve for depreciation | 18,520.00 | | |
| Capital stock | 100,000.00 | 100,00.00 | 100,000.00 |
| Surplus | 813.10 | [1] 15,814.16 | 1,177.60 |
|  | 955,869.97 | 668,798.85 | 322,872.85 |

[1] Deficit.

The capital, invested and borrowed, that was available in the business of the Cleveland & Western Coal Co. at various dates is shown in the following schedule:

|  | Jan. 1, 1918 | Jan. 1, 1919 | Jan. 1, 1920 |
|---|---|---|---|
| Capital stock | $500,000.00 | $1,000,000.00 | $1,000,000.00 |
| Surplus | 975,962.87 | 892,778.77 | 1,060,459.90 |
| Notes payable (banks) | 325,000.00 | 415,000.00 | 869,287.85 |
| Total | 1,800,962.87 | 2,307,778.77 | 2,929,747.75 |

The Cleveland & Western, in order to obtain coal for its customers, financed many of the companies for which it sold coal by loaning such companies large sums of money for indefinite periods and also by advancing funds in contemplation of future shipments of coal.

The Cleveland & Western had entered into written contracts with various mining corporations to sell coal in accordance with the terms of said contracts and to guarantee the payment to the companies for all coal shipped under said contracts. The business of the Cleveland & Western consisted in part, and the business of the Wisconsin Coal & Dock Co. consisted almost entirely, of buying and selling coal as a principal.

In nearly all of the transactions in the purchase and sale of coal, the Cleveland & Western and the Wisconsin Coal & Dock ordered, sold, billed, collected and paid for coal in their respective names.

On the coal shipped by the Cleveland & Western Coal Co. to the lake front it paid the freight charges from its own funds and included such charges in its bills to the purchasers. The freight charges so paid amounted to $2,413,547.21 and $2,208,195.82 for 1918 and 1919, respectively.

Subsequent to the organization of the Cleveland & Western Coal Co., and at the first meeting of the stockholders held February 27, 1913, the following resolution was adopted:

The preferred stock is to be sold only for cash, and at no less than par, and each share of preferred stock is to carry with it one-half share of the common stock as a bonus; which common stock, so far as the company is concerned, is to be regarded as fully paid and non-assessable.

To F. E. Taplin are to be issued five hundred (500) shares of the common stock, already subscribed for by him, as fully paid and non-assessable; said stock is issued to him in consideration of his good will and patronage which he brings to this company, and of his services rendered and to be rendered in the promotion and financing of the company; in consideration of which he is relieved of any cash payment for said five hundred (500) shares of common stock so subscribed for by him.

Pursuant to the resolution, common stock of the par value of $87,300 was issued and good will in the amount of the par value of the capital stock so issued was set up on the books of the Cleveland & Western. During the years 1914, 1915, and 1916, the good will account was entirely written off by charging profits and crediting the

good will account. The amounts so taken from the account were restored on January 1, 1920, and the surplus account was credited with the amount thereof.

Prior to the acquisition by the taxpayer of the Meadow Lands Coal Co., A. S. McQueen, of Pittsburgh, Pa., was in close touch with the receivers and the stockholders of that company. In 1915 the Cleveland & Western informed McQueen that it was desired to obtain the right to sell the coal of the Meadow Lands Coal Co., and thereafter it secured from the receivers a contract for one year beginning April 1, 1916, for the right to sell the coal produced by that company. While this contract was in force the stockholders of the Cleveland & Western secured sufficient stock of the Meadow Lands Coal Co. to exercise a control over it. In order to secure a renewal of the contract with the Meadow Lands Coal Co., the Cleveland & Western obtained, through the influence of McQueen, the consent of the receivers to the dissolution of the receivership. After securing the contract with the Meadow Lands Coal Co., and after the stockholders of the Cleveland & Western had secured sufficient capital stock to control said corporation, and after the receivership had been dissolved, the Cleveland & Western paid McQueen $10,000. James S. Boggs, one of the receivers of the Meadow Lands Coal Co., was paid the sum of $5,300 in 1917 for consenting to the dissolution of the receivership of said corporation.

Taxpayer seeks special assessment under the provisions of sections 327 and 328 of the Revenue Act of 1918 and predicates its claim of abnormalities upon (1) good will of considerable but undetermined value not reflected in invested capital, (2) F. E. Taplin's guarantee of accounts payable for coal purchased, (3) a line of credit established through F. E. Taplin's acquaintance with bank officials, (4) investments of large sums in Liberty bonds and non-income producing stock of mining companies, and (5) expenditures amounting to $15,300 resulting in the obtaining of the Meadow Lands contract, which amount was neither capitalized nor allowed as expense. The taxpayer further claims that the same abnormalities existed in 1918 which were found by the Department to justify special assessment in 1917, and it submitted as comparatives the following-named corporations for the year 1918:

| | C. & W. C. Co. | W. C. Atwater & Co. | White Oak C. Co. | Pgh. & Ohio Mining Co. | Crozer Pocahontas Co. |
|---|---|---|---|---|---|
| Invested capital | $1,223,249.10 | $744,354.62 | $562,699.32 | $411,348.33 | $379,726.14 |
| Total sales | 12,594,213.57 | 8,116,252.42 | 4,527,188.31 | 6,236,445.43 | 4,766,264.86 |
| Net taxable income | 479,302.82 | 203,616.37 | 130,497.56 | 79,639.25 | 55,342.50 |
| Income tax | 21,485.05 | 16,580.36 | 8,582.10 | 5,840.85 | 5,591.66 |
| Profits tax | 283,182.33 | 61,481.31 | 56,982.10 | 28,403.54 | 6,589.32 |
| Turnover | 10.3 times. | 10.9 times. | 8 times. | 15.16 times. | 12.5 times. |
| Ratio of income to invested capital | *Per cent* 39.18 | *Per cent* 27.3 | *Per cent* 23.2 | *Per cent* 19.36 | *Per cent* 14.6 |
| Ratio of income to sales | 3.8 | 2.5 | 2.9 | 1.28 | 1.16 |
| Ratio of profits tax to income | 59.08 | 30.2 | 43.66 | 35.66 | 11.9 |

The Commissioner denied special assessment to the taxpayer for the year 1918, upon the ground that the taxpayer has failed to prove that it meets the provisions of section 327 and that no abnormalities existed in 1918 which would justify special assessment.

## OPINION.

GREEN: The issues involved in this case are: (1) Were the Cleveland & Western Coal Co. and the Wisconsin Coal & Dock Co. during the years 1918 and 1919 personal service corporations, within the meaning of section 200 of the Revenue Act of 1918? (2) Is the Cleveland & Western Coal Co. entitled, under the provisions of section 326 of the Revenue Act of 1918, to include in its invested capital for the years 1918 and 1919 the sum of $87,300, representing capital stock issued for alleged good will? (3) Is the Cleveland & Western Coal Co. entitled, under the provisions of section 326 of the Revenue Act of 1918, to include in its invested capital for the years in question the sum of $15,300, representing the amount paid during 1917 to A. S. McQueen and James S. Boggs? (4) Are the Cleveland & Western Coal Co. and the Wisconsin Coal & Dock Co. entitled to a determination of their profits taxes under the provisions of section 328 of the Revenue Act of 1918? The issues will be disposed of in the order above given, and, in considering whether either or both the Cleveland & Western Coal Co. and the Wisconsin Coal & Dock Co. were personal service corporations, each will be considered separately.

The balance sheets of the Cleveland & Western show that the total of the items making up invested and borrowed capital amounted to $1,800,962.87 at January 1, 1918; $2,307,778.77 at January 1, 1919, and $2,929,747.75 at January 1, 1920. Capital is shown to have been used in financing a number of mining companies and the business of the Wisconsin Coal & Dock Co. This contributed to the successful operation of its business. Part of the business of the Cleveland & Western consisted of the sale of coal under contracts in which the Cleveland & Western agreed, among other things, to sell all the coal produced by certain mining companies, to guarantee the payment for all coal sold and, under some of the contracts, to make advances of funds. The balance of the business consisted largely of the purchase and sale of coal as a principal. It paid interest amounting to $35,235.51 during the year 1918 and $31,447.90 during the year 1919. From these facts it is evident that capital, invested and borrowed, was a material income-producing factor. *Appeal of C. N. Merritt & Brother, Inc.*, 1 B. T. A. 927.

The evidence shows that a large part of the sales of this corporation was made by it as a principal. There is serious doubt whether taxpayer has proved that less than 50 per cent of the gross income consisted of income earned through trading as a principal, but, since our opinion will turn on another point, further discussion of this one is unnecessary.

One of the requirements of section 200 of the Revenue Act of 1918 is that the principal stockholders must be regularly engaged in the active conduct of the business of the taxpayer. Three of the stockholders collectively holding a substantial amount of stock devoted no time to the conduct of the business, while the other stockholders had other important business connections and interests to which they devoted some of their time. This corporation fails to meet this test. *Appeal of J. J. Harrington*, 1 B. T. A. 11; *Appeal of C. W. Simpson Co.*, 1 B. T. A. 995.

The capital stock of the Wisconsin Coal & Dock Co. was all owned by the Cleveland & Western Coal Co. during the years in question. The fully paid capital stock of $100,000 and the large credit extended to this corporation by the Cleveland & Western Coal Co. permitted the taxpayer to own large dock properties, carry customers, and maintain large inventories of coal as shown by the balance sheet. For this reason it can not be said of this corporation that its income was "ascribed primarily to the activities of its principal stockholders who were regularly engaged in the active conduct of its business." It is also very apparent that capital, invested and borrowed, was a material income-producing factor. *Appeal of Hanley-Ried & Co.*, 2 B. T. A. 315.

The second issue involved in this appeal is whether the Cleveland & Western Coal Co. is entitled, under the provisions of section 326 of the Revenue Act of 1918, to include in its invested capital the sum of $87,300, representing capital stock alleged to have been issued for good will.

During the years 1913, 1914, and 1915, the Cleveland & Western Coal Co. issued common stock of the par value of $87,300 to F. E. Taplin, J. M. Todd, F. E. Danielson, and C. F. Taplin, who, it is claimed, brought good will to the business. The minutes of the first meeting of the stockholders indicate that there were two conditions under which this stock would be issued. Each share of preferred stock was to carry with it one-half share of common stock as a bonus. The par value of the stock issued as a bonus was $37,300 and the only consideration required by the corporation was the purchase of preferred stock. Fifty thousand dollars of the common stock is indicated in the minutes to have been issued to F. E. Taplin in consideration of the good will and the patronage which he brought to

this company and of services rendered and to be rendered in the promotion and financing of the company. These facts indicate that the corporation did not consider that the stock was being issued solely for good will, although F. E. Taplin was paid a substantial salary for the services rendered by him to the corporation. The corporation endeavored to prove a value for the good will of $87,300 by furnishing a list of customers to F. E. Taplin to whom coal was sold subsequent to incorporation. In the opinion of the Board, the evidence is insufficient to establish that the good will had any actual cash value. *Appeals of Saenger Amusement Co.*, 1 B. T. A. 96; *W. E. Marshall & Co.*, 1 B. T. A. 175; *Wright's Automatic Tobacco Packing Machine Co.*, 1 B. T. A. 1260; and *Providence Mill Supply Co.*, 2 B. T. A. 791.

The third issue involved in this appeal is whether the Cleveland & Western Coal Co. is entitled, under the provisions of section 326 of the Revenue Act of 1918, to include in its invested capital the sum of $15,300, representing the amount paid during 1917 to A. S. McQueen and James S. Boggs.

The Meadow Lands Coal Co. was in the hands of receivers until March 20, 1917, and had been for some time prior thereto. During the year 1915 the Cleveland & Western, through one of its officers, informed McQueen that it desired a contract for the coal produced by that company and asked McQueen if he would use his influence with the receivers in aiding the Cleveland & Western in obtaining such contract. The Cleveland & Western did secure said contract for one year, beginning April 1, 1916. During the life of this contract the stockholders of the Cleveland & Western purchased sufficient capital stock of the Meadow Lands Coal Co. to control it, provided the receivership was dissolved. In order to obtain a new contract when the old contract expired April 1, 1917, the Cleveland & Western desired termination of the receivership, and through the influence of McQueen the receivership was terminated. After the receivers had agreed to the termination of the receivership, the taxpayer, during the year 1917, paid $10,000 to McQueen and $5,300 to James S. Boggs, the latter being one of the receivers of the Meadow Lands Coal Co. The question is whether the two payments totaling $15,300 are properly allowable as invested capital, during 1918 and 1919, to the Cleveland & Western Coal Co.

The evidence as to the purpose of the payment to McQueen and the circumstances surrounding that payment is wholly insufficient to enable the Board to determine whether it was an ordinary and necessary expense or a capital expenditure. The amount paid to Boggs, one of the receivers of the coal company, is neither a capital expenditure nor an ordinary and necessary business expense. A receiver is an officer of the court and is paid for his services by court

decree. For an outside party to pay or agree to pay him for his services as a receiver is contrary to public policy. The amounts paid to McQueen and Boggs, amounting to $15,300, are not allowable as invested capital during 1918 and 1919, because the amounts so paid were not expended for any asset used in the business during the years under consideration, nor were the amounts so expended proper capital expenditures.

The fourth issue involved in this appeal is whether the Cleveland & Western and the Wisconsin Coal & Dock Co. are entitled, under the provisions of section 327 of the Revenue Act of 1918, to a determination by the Commissioner of their profits taxes under the provisions of section 328. A taxpayer must come within the provisions of section 327 in order to be entitled to computation of its profits taxes under the provisions of section 328. Section 327 contains four conditions, one of which must be met before the taxpayer is entitled to consideration under the provisions of section 328. From the evidence submitted it is clear that the taxpayer does not meet any one of the first three conditions, and unless it meets the fourth condition it is not entitled to a computation of its taxes under section 328. The fourth condition, above referred to, provides as follows:

> Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, nor (2) in which 50 per centum or more of the gross income of the corporation for the taxable year (computed under section 233 of Title II) consists of gains, profits, commissions, or other income, derived on a cost-plus basis from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

Section 327 (d) provides that an " exceptional hardship " must be evident and that a " gross disproportion " exists owing to abnormal conditions," and, until this is shown, taxpayer is not entitled to the benefits of this act. The act also provides that this subdivision shall not apply to any case in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital. The record in this case indicates that the taxpayer did earn a larger net income during the period of the war than during prior years. It was from such excess war profits that Congress apparently intended to derive revenue when it enacted the Revenue Act of 1918.

The fact that the taxpayer considers its tax too high and that the taxes of a few other corporations are lower than the tax proposed against the taxpayer, is not sufficient to prove that an " exceptional hardship " had been worked or that a " gross disproportion " exists " owing to abnormal conditions." The efficient operation of the corporation resulting in a rate of turnover of its capital in excess of the average rate of turnover does not produce an abnormal condition affecting capital or income which warrants the computation of the tax under section 328 of the Revenue Act of 1918. *Appeal of United Shoe Stores Co.*, 2 B. T. A. 73.

> *The deficiency is $304,667.38 for 1918, and $46,669.76 for 1919. Order will be entered accordingly.*